# Order

**Michigan Supreme Court**
**Lansing, Michigan**

June 4, 2010

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

140775

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff-Appellant,

v

MARY M. WATERSTONE,
      Defendant-Appellee.

SC: 140775
COA: 294667
Wayne CC: 09-015867-AR

_____/

On May 11, 2010, the Court heard oral argument on the application for leave to appeal the March 4, 2010 judgment of the Court of Appeals. On order of the Court, the application is again considered. MCR 7.302(H)(1). In lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals, and REMAND this case to the 36th District Court for further proceedings not inconsistent with this order. Given that appeals have already delayed a preliminary examination by 14 months since issuance of the criminal charges, and given that a full opinion could not proceed until the next term of this Court if leave to appeal were to be granted, we are satisfied that prompt resolution of this matter by issuance of an order is warranted. The Court of Appeals erred in holding that the Attorney General's office is disqualified from acting as special prosecutor. While recognizing that the Attorney General is subject to the rules of professional conduct, we hold that disqualification is not required in this case because accommodation of his unique constitutional and statutory status will not infringe on the defendant's right to a fair prosecution. See *Attorney General v Public Service Comm'n*, 243 Mich App 487 (2000). The Attorney General's unique status "requires accommodation," *id*. at 506, and such accommodation is particularly apt where no evidence has been presented of any prejudice that would be suffered by the defendant. We further hold that the Court of Appeals erred in suppressing the defendant's statements during the November 25, 2008 interview at her home. The defendant did not move for suppression of these statements in the lower courts and, thus, the Court of Appeals fact-finding and suppression rulings were premature. This order, however, does not preclude the defendant from pursuing suppression in the lower courts, nor does it preclude the Attorney General from conceding to suppression.

WEAVER, J. (*concurring*).

I join and concur in the order reversing and remanding this case to the district court for further proceedings. I write separately to note:

The order of this Court provides due and proper process to the defendant judge, charged with allowing perjured testimony in a trial over which the judge presided. The Court's order gives the judge the specific opportunity to move for suppression of any evidence that she believes was unfairly obtained against her.

Justice YOUNG's dissent is quite a contrast to the straightforward, clear, and brief order of this Court. His dissent is lengthy and confused, and it provides no satisfactory solution to the fears he attempts to create.

Further, I note that Justice CORRIGAN is not participating because as she states: "I am not participating because I may be a witness in this case."

The Code of Judicial Conduct, Canon 2C states:

> A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge should not use the prestige of office to advance personal business interests or those of others. A judge should not appear as a witness in a court proceeding unless subpoenaed.

On September 25, 2009 in *People v Aceval*, No. 138577, a related case to this case, *People v Waterstone*, Justice CORRIGAN stated:

"I am not participating because I may be a witness in a related case."

Regarding this statement, on September 28, 2009 the *Detroit News* reported:[1]

> "Contacted at her home by The News on Sunday, Corrigan said, 'I was asked to be a character witness, and I agreed.'"

Has Justice CORRIGAN agreed to be a "character witness" in this case as quoted in the *Detroit News*?

Has Justice CORRIGAN been subpoenaed in this case? If so, when?

What is Justice CORRIGAN's relationship, if any, to the accused defendant Judge Waterstone?

---

[1] *The Detroit News,* "Supreme Court judge could be trial witness." Doug Guthrie, September 28, 2009.

YOUNG, J. (*dissenting*).

"*Loyalty is an essential component in the lawyer's relationship to a client.*"[2]

I dissent from the order reversing the Court of Appeals decision. Instead, I would grant leave on the broader question of how the Michigan Rules of Professional Conduct apply to the Attorney General's unique role as the chief legal officer of this State. The Michigan Rules of Professional Conduct (MRPC) establish necessary principles and rules to safeguard a fair adversarial system of justice under the law. I agree that the common law and constitutional role of the Attorney General requires accommodation, not an exception, in *applying* general ethical rules to specific situations, because the general rules do not fully encompass the Attorney General's unique role.[3] Nevertheless, we must be careful that, in forging the proper accommodation that would allow the Attorney General to carry out his various and sometimes conflicting functions, we do not jettison the important ethical principles that all lawyers must follow.

Unfortunately, I believe this is exactly what the majority has done. The order they have issued is intentionally and artfully obscure. It cursorily reverses the Court of Appeals decision and fails to offer a scintilla of rationale for the majority's decision in this case. The majority has provided no rationale, and I do not pretend to have a clear idea regarding how to tailor the MRPC to this case. That is precisely why I believe that this Court ought to grant appellant's application for leave to appeal so that the parties— and *amici*—can more fully brief this Court about the real-world consequences of accommodations that should or should not be made when applying the MRPC to the Attorney General.

## FACTS & PROCEDURAL BACKGROUND

Particularly since the majority has decided to dispose of this weighty matter in a cryptic order, some presentation of the facts is necessary to understand why the majority's resolution is entirely unsatisfactory.

The defendant is a retired Wayne County Circuit Court judge, and this case involves allegations that she knowingly allowed witnesses to commit perjury during the criminal trials of Alexander Aceval and Ricardo Pena.

---

[2] Comment to MRPC 1.7.

[3] See *Attorney General v Pub Serv Comm*, 243 Mich App 487, 506 (2000) ("[T]he Attorney General's unique status *requires accommodation, not exemption, under the rules of professional conduct*.") Emphasis added.

Following his trial, Aceval filed a civil rights action in federal court against the defendant, alleging that she "allowed . . . perjured testimony to go to the jury" and that she conducted "secret ex-parte hearings" with the prosecutor assigned to the case. At that time, the General Counsel of the Michigan Supreme Court requested that the Attorney General represent defendant, pursuant to 2006 PA 345.[4] An Assistant Attorney General within the Public Employment, Elections, and Tort (PEET) Division filed an answer on behalf of the defendant that denied any civil liability and asserted various affirmative defenses. In March 2008, the federal district court dismissed Aceval's complaint without prejudice. The Wayne County Circuit Court's counsel communicated this dismissal to Judge Waterstone by letter.

Following the federal court dismissal, an investigation was launched regarding various government officials' conduct in handling the Aceval matter—including, unbeknownst to her, Judge Waterstone. The Wayne County Prosecutor's Office disqualified itself from any investigatory or prosecutorial responsibilities involving Aceval's allegations of misconduct, and requested appointment of a special prosecutor in the matter. After the Oakland, Monroe, Genesee, and Washtenaw County Prosecutors each declined appointment, the Criminal Division of the Attorney General's office accepted appointment, apparently without knowing that Attorney General lawyers had previously represented Judge Waterstone on similar claims in the civil action.

The Attorney General's investigation ensued. On November 25, 2008, the Attorney General's Special Agent, Michael Ondejko, met with the defendant at her home to deliver an investigative subpoena. During the 30 minute interview, Judge Waterstone spoke unguardedly, once Agent Ondejko confirmed for her that the Attorney General was investigating *the prosecutor that brought Aceval to trial*, Karen Plants. A portion of the interview, which Agent Ondejko secretly recorded, proceeded as follows:

MR. ONDEJKO. I—I work for the Attorney General's Office now—

MS. WATERSTONE. Right.

MR. ONDEJKO. –and I've been tasked with doin' an investigation into the perjury that occurred at the Pena/Aceval trial.

MS. WATERSTONE. Right.

---

[4] 2006 PA 345, § 302(2) provides that the Attorney General "shall defend judges of all state courts if a claim is made or a civil action is commenced for injuries to persons or property caused by the judge through the performance of the judge's duties while acting within the scope of his or her authority as a judge."

* * *

MR. ONDEJKO. Well—and I've been through all the—the transcripts and talked to a lot of people. And I mean, just really doesn't seem to be any mystery. I mean, it—it pretty much is all black and white. But I guess—well, two things. There's a list of people that we're gonna do investigative subpoenas with; have 'em come in and—I don't know if you know John Dakmak?

MS. WATERSTONE. [inaudible]

MR. ONDEJKO. You remember? Okay. John is gonna be the assistant. He's now with the office.

MS. WATERSTONE. Yep.

MR. ONDEJKO. And he's gonna be the assistant in charge of that—those interviews. So we've got you on the list as well as about 20 others.

MS. WATERSTONE. As far as me.

MR. ONDEJKO. Yeah.

MS. WATERSTONE. This is in Karen Plants' investigation.

MR. ONDEJKO. Yes, yes. That's-

MS. WATERSTONE. I assumed that it—

MR. ONDEJKO. I—

MS. WATERSTONE. –that's what it was about.

MR. ONDEJKO. –should've mentioned that.

MS. WATERSTONE. That's okay. That was a—it was kind of an assumption, but I thought I should reclarify.

MR. ONDEJKO. Yeah. That's kinda, you know, that's what it centers around. And then the officers who, you know, perjured themselves.

*After receiving this assurance* that the Attorney General's investigation focused on the prosecutor, Judge Waterstone discussed the trial in detail. Throughout the interview, Agent Ondejko *did not inform her that she was a potential target of the investigation and did not advise her of her right to seek independent counsel or remain silent*. And this interview occurred to Judge Waterstone's detriment notwithstanding the fact that the Attorney General's office had previously *defended* her in the federal litigation for the same conduct for which it is now prosecuting her. At the conclusion of the interview, Agent Ondejko served defendant with an investigative subpoena, ordering her to appear for a deposition on December 1, 2008.

The defendant appeared at her deposition without separate counsel. At the beginning of the deposition, Assistant Attorney General John Dakmak read the defendant her rights:

> MR. DAKMAK. You understand that you have the right not to incriminate yourself, give any act that could get you charged or potentially charged with a criminal act at any point. Do you understand that?
>
> MS. WATERSTONE. I do.
>
> MR. DAKMAK. And, of course, you have the right to consult with an attorney who could advise you on whether or not you should answer those questions. Do you understand?
>
> MS. WATERSTONE. I understand.
>
> MR. DAKMAK. … Do you have any questions for me regarding your rights afforded to you under the Michigan [or] United States Constitution?
>
> MS. WATERSTONE. No. My understanding was this involved the investigation regarding Karen Plants; is that correct?
>
> MR. DAKMAK. Involving the investigation surrounding the trial of Alexander Aceval, Ricardo Pena, Wayne County Prosecutor's Office and the police department.
>
> MS. WATERSTONE. Okay. That's a little broader than I understood.
>
> MR. DAKMAK. *Just so you know, we haven't narrowed it down to a defendant. We haven't charged anybody with a crime yet. We're investigating the acts, everything surrounding it. Do you understand*?
>
> MS. WATERSTONE. I understand.

MR. DAKMAK. Do you want to go forward and answer the questions we put forth to you today?

MS. WATERSTONE. Sure.[5]

Noteworthy about this exchange is Mr. Dakmak's failure to disclose that Judge Waterstone was herself a potential target of the investigation. In light of the prior representation, I submit that it is at least *arguable* that the Attorney General had a duty to make a disclosure that Judge Waterstone was a potential target. Instead, Mr. Dakmak gave a very "lawyer-like" and non-committal answer that was designed to allay any concerns Judge Waterstone might have had about the deposition, thus providing his office cover to prosecute Judge Waterstone without truly informing Judge Waterstone what was occurring. The deposition lasted approximately an hour and a half, and Judge Waterstone discussed additional specific information regarding the Aceval and Pena trials.

The Attorney General subsequently charged the defendant with four counts of common law misconduct in office, which is punishable under MCL 750.505.[6] The information alleges that the defendant "willfully neglect[ed] her duties by permitting or considering improper ex parte communications" and "willfully neglect[ed] her duties by allowing/concealing perjured testimony."

The day before charging the defendant, the Criminal Division was informed that the PEET Division had represented defendant in the related civil action. At this point, the Attorney General's ethics officer erected a conflict wall between the lawyers conducting the criminal prosecution and those who had defended Judge Waterstone in the civil case. The Attorney General did not seek the defendant's waiver of the conflict. Why erecting the conflict wall at this point was deemed a sufficient response to the Attorney General's ethical responsibility is not explained in the record.

The defendant moved to disqualify the Attorney General's office from prosecuting her because of the unwaived conflict of interest, claiming to have had "a series of confidential communications" with the Assistant Attorney General who served as her

---

[5] Emphasis added.

[6] MCL 750.505 provides: "Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court."

counsel "about the events that occurred during the trial, including the basis for the rulings made during the Aceval/Pena matter . . . ." She also averred that she had "never been asked, nor would [she] consent, to waiving the attorney/client privilege [she has] established with the Michigan Attorney General's office." Finally, she averred that, had she been informed that she was a subject or target of the Attorney General's criminal investigation, she "would have objected to the Attorney General's efforts to interview and depose [her] under oath" and, at minimum "would have insisted on the right to consult with an independent attorney. . . ."

The district court denied Judge Waterstone's motion to disqualify on the grounds that the Attorney General's unique status precluded the mechanical application of the MRPC, that its representation of Judge Waterstone had concluded prior to the beginning of the investigation, and that no evidence indicated that the two divisions of the Attorney General's office shared information.

On appeal, the circuit court affirmed the district court's decision. After the Court of Appeals denied Judge Waterstone's interlocutory application for leave to appeal, this Court remanded to the Court of Appeals as on leave granted to consider specific provisions of the MRPC,[7] and the Court of Appeals reversed the lower courts' decisions.[8] In holding that the Attorney General must be disqualified, the Court of Appeals determined that the Office of the Attorney General is a "firm" within the meaning of MRPC 1.10(a) "under these circumstances and for purposes of this case only."[9] It determined that because "the Attorney General was asked to investigate the admission of perjury against a former client that it had defended against the same claim," there was an unacceptable risk that "defendant would continue to believe that she was a client of the Attorney General despite the Criminal Division's prosecution against her…where the Criminal Division failed to consult with her regarding the conflict."[10] The Court of Appeals also ordered the defendant's statements made to Agent Ondejko suppressed.

This Court ordered oral argument on the Attorney General's application for leave to appeal.[11]

---

[7] 485 Mich 1016.

[8] Published opinion of the Court of Appeals, issued March 4, 2010 (Docket No. 294667).

[9] *Id*. at ___.

[10] *Id*. at ___.

[11] 485 Mich 1133.

ANALYSIS

For any other organization of lawyers, the Attorney General's decision to pursue a case in direct opposition to its client in the same matter as its prior representation would be a frank conflict of interest and a violation of the duty of loyalty to a client.[12]  Indeed, the Court of Appeals held that, under the unique facts of this case, the Attorney General's office must be disqualified and the defendant's statements to Agent Ondejko suppressed. A majority of this Court obviously disagrees with that assessment, but its peremptory order does not explain why the Court of Appeals' analysis was erroneous.

Were the existence of such a conflict so unique as to be unlikely ever to recur, a Delphic order from this Court narrowly disposing of this case might be pardonable. However, at oral argument on the application for leave to appeal, the Solicitor General argued that the Attorney General repeatedly faced the prospect of this very kind of situation and urged that the Attorney General not be precluded from prosecuting those public officials and state employees it had previously represented.  Consequently, the dilemma presented by this case is not one of a kind, and there is need to understand what ethical responsibilities the Attorney General owes its clients.

I am extraordinarily troubled by the majority's decision merely to reverse the decision of the Court of Appeals without articulating a clear and definite rule of law.  The bench and bar—not to mention current and future clients of the Attorney General—deserve to know what ethical principles apply when, as here, the Attorney General represents an individual in a matter and then chooses to prosecute that person concerning the very conduct involved in its initial representation.

---

[12] MRPC 1.7(a) provides: "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation."

This limitation does not end when the representation ends.  MRPC 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation."

Finally, MRPC 1.10(a) imputes this rule to all members of a law firm: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[]…1.9(a)…."

As it stands, the Court's order does not even recognize the *existence* of a conflict of interest in the Attorney General's exercise of prosecutorial discretion to the detriment of its previous client concerning the very same conduct for which It previously had defended her. This failure to recognize the inherent conflict in the Attorney General's exercise of prosecutorial discretion is especially strange in light of the majority's only citation of authority: *Attorney General v Pub Serv Comm*.[13] *Public Service Commission* accommodates the MRPC to the Attorney General but expressly acknowledges that "a conflict of interest arises when the Attorney General intervenes as a party in opposition to a state agency that she represents as counsel."[14] Here, the conflict is even more patent than in *Public Service Commission*: Judge Waterstone was defended by Attorney General lawyers for the same conduct for which the Attorney General is now prosecuting her.

Here, the majority's order invokes, but does not apply, a vague balancing test of "accommodation of the Attorney General's unique status and discharge of his constitutional and statutory duties" with "the defendant's right to a fair prosecution." Because the majority no more than "invokes" this notion, I cannot discern how this "balancing test" is applied. As far as I am able to tell, it fails to protect the rights of clients, a cornerstone of the very rules of professional conduct that the majority purports to apply, to say nothing of constitutional protections afforded criminal defendants. The MRPC seek to promote ethical action by lawyers by establishing a legal system in which a client can reasonably rely on the zealousness of her counsel to represent only her interests. This allows a client to have confidence that she can fully disclose all that should be disclosed—and rely on the undivided loyalty of her lawyer. Moreover, in applying any accommodation of the MRPC to the unique office of Attorney General, is it not relevant that the Attorney General exercised its prosecutorial *discretion* in accepting appointment as special prosecutor in this case? Nothing requires that the Attorney General prosecute these actions, and indeed, many county prosecutors were not even asked to accept an appointment as special prosecutor in this case.

The majority's oracular resolution prompts several obvious questions that its order cannot answer:

(1) What impact does the fact that this case involves a *criminal prosecution* have on the appropriate accommodations that must be made in applying the MRPC to the Attorney General?

(2) If this is not a frank case of a client conflict, why isn't it?

---

[13] 243 Mich App 487 (2000).

[14] *Id*. at 516.

(3) What set of relationships or circumstances would *ever* create a conflict for the Attorney General when it has previously represented an individual?

(4) What obligation of loyalty does the Attorney General *ever* owe to its clients?

(5) Should we have any concern that failing to recognize a conflict in this situation will hinder cooperation from future Attorney General clients who, after today, will have a reasonable basis to fear that they might later be prosecuted by their lawyer?

The majority's decision to punt on the question of what ethical rules actually do apply to the Attorney General, and how they apply, is a frank abdication of this Court's constitutional responsibility to declare what are the ethical rules of Michigan and sows unnecessary uncertainty in the law.[15] If the Court of Appeals erred in failing properly to "accommodate" the unique status of the Attorney General to the Michigan Rules of Professional Conduct, this Court has a duty to explain what accommodation is required and how the Attorney General should acquit itself in future cases in which it has represented an individual that it later wishes to prosecute for conduct it previously defended.

I think it particularly noteworthy that none of the Attorney General lawyers or agents in their interactions with Judge Waterstone purported to be other than representatives of "the Attorney General," not representatives of their respective divisions within the Office of Attorney General.[16] Accordingly, she had every reason to believe that each of them was "her" attorney. At a minimum, this Court should not allow the use of confidential and potentially incriminating information gathered while the defendant was induced into operating under the false pretense that she was speaking with representatives of *her* attorneys. Leaving this defendant without any remedy when the

---

[15] Const 1963, art 6, § 5.

[16] See MRPC 1.10, Amended Comment, "Definition of 'Firm': "For purposes of these rules, the term 'firm' includes lawyers in a private firm and lawyers employed in the legal department of a corporation or other organization or in a legal services organization. Whether two or more lawyers constitute a firm within this definition can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. *However, if they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the rules*." (Emphasis added.)

lawyers she justifiably expected to protect her turned on her and prosecuted her is simply shameful.[17]

As stated, I do not claim to know how precisely to "accommodate" the Michigan Rules of Professional Conduct to this case. However, I do believe, first, that the defendant had a reasonable expectation that the very lawyers who had previously defended her would not be permitted to prosecute her for the very same conduct and, second, that she was prejudiced by this expectation in her subsequent dealings with the Attorney General's investigator and Criminal Division lawyers. During her interview with Agent Ondejko and her deposition, the defendant clearly thought she was speaking to "*her* attorneys" and helping them conduct an investigation into the actions of the Wayne County Assistant Prosecuting Attorney. She had no expectation that she was the target of a criminal investigation by representatives of the Attorney General's legal staff—which staff, through other assistant Attorneys General, had previously defended *the very conduct for which she is now being prosecuted*.

CONCLUSION

In this case, both the Attorney General and the majority accept a world in which the backbone of our legal system—an attorney's undivided loyalty to his or her client—is ignored and trampled because of the unique nature of the Attorney General. This decision fails to recognize the interest that clients of the Attorney General have in zealous, loyal, and confidential representation. (This is an interest that I would imagine the Attorney General and his lawyers share.) Otherwise, the Attorney General's clients have an incentive to withhold crucial information that they fear may someday be used in a prosecution by the very agency that represents them. In essence, what the Attorney General is claiming in this case is that he doesn't *really* "represent" anybody, and so reliance on the advocacy of his lawyers is at the client's peril. The majority accepts this premise without qualification or explanation.

As a consequence of the Court's order, the Attorney General now has *carte blanche* to represent anyone and then use statements or other information obtained during its investigation in future prosecutions, even when the Attorney General permits the defendant to believe it was acting in her interest. In sum, it turns the shield of attorney

---

[17] The shame I refer to is borne by the majority of this Court, not the Attorney General. I do not mean to impute to any Attorney General lawyer or agent any bad or unethical motivation. As far as the record shows, all performed their various duties completely unaware that they were investigating and prosecuting a client other lawyers of the Office of Attorney General had previously defended – until just before the Attorney General brought charges. However, as stated, once that knowledge was shared, one wonders why a "wall" separating those who had defended Judge Waterstone from those who would prosecute her was a sufficient ethical response to this situation.

loyalty into a sword for prosecution. No one, not the Attorney General, lawyers in general, their respective clients or our legal system, should welcome such a prospect. This case cries out for a reasoned set of principles. Unfortunately, my colleagues in the majority are unwilling to supply them.

For these reasons, I must lodge my vigorous dissent. I would grant leave to appeal.

HATHAWAY, J., would grant leave to appeal.

CORRIGAN, J., states as follows:

I am not participating because I may be a witness in this case.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 4, 2010

_Corbin R. Davis_
Clerk

d0601