MONROE v STATE EMPLOYEES' RETIREMENT SYSTEM

Docket No. 297220. Submitted May 3, 2011, at Marquette. Decided June
    28, 2011. Approved for publication August 18, 2011, at 9:00 a.m.
    Sandra Monroe, a former nurse at the Alger Maximum Correctional
        Facility, applied for nonduty disability retirement benefits from
        the Office of Retirement Services (ORS), which administers four
        Michigan retirement systems including the State Employees'
        Retirement System—the retirement plan from which Monroe
        sought benefits. Monroe asserted, in relevant part, that she was
        disabled because of depression. The ORS referred Monroe to
        psychiatrist Lynn Miller for an independent psychiatric evalua-
        tion. Miller opined that Monroe was currently unable to work
        because of depression, but that her condition might be remedied by
        available treatment. An independent medical advisor to the ORS,
        Ashok Kaul, then assessed Monroe's mental condition by review-
        ing the medical records of Monroe's treating health-care providers,
        the report prepared by Miller, and reports prepared by two
        additional independent psychiatric evaluators. Kaul opined that
        although Monroe might have been currently disabled, with ongo-
        ing psychiatric care her condition could improve to the point that
        she could return to work. The ORS denied Monroe's application
        for nonduty disability retirement benefits. Monroe requested a
        contested case hearing. Following the hearing, the State Employ-
        ees' Retirement System Board (SERSB) issued a decision and
        order denying Monroe's appeal. The SERSB concluded that be-
        cause no medical advisor had certified that Monroe was totally and
        permanently disabled, the board did not have the discretion to find
        her so disabled and, thus, her application for nonduty disability
        retirement benefits had been properly denied. Monroe sought
        review of the SERSB's decision in the Alger Circuit Court. The
        court, William W. Carmody, J., affirmed the decision of the SERSB.
        Monroe appealed by leave granted.
        The Court of Appeals held:
        1. There are four situations that present a constitutionally
    intolerable risk of actual bias and warrant the disqualification of a
    decision-maker: (1) the decision-maker has a pecuniary interest in
    the outcome, (2) the decision-maker has been the target of

personal abuse or criticism from the party before him or her, (3) the decision-maker is enmeshed in other matters involving the petitioner, and (4) the decision-maker might have prejudged the case because of prior participation as an accuser, investigator, fact-finder, or initial decision-maker. In this case, the SERSB had included a member of the Attorney General's office, and that office had also served as the advocate opposing her application for benefits. However, the Assistant Attorney General who sat on the SERSB had no pecuniary interest in the proceeding, had not been the target of abuse or criticism by Monroe, was not enmeshed in other matters with Monroe, and was not involved previously as an accuser, investigator, fact-finder, or initial decision-maker. Rather, the members of the Attorney General's office involved in this case served different functions for different entities. Accordingly, Monroe was not deprived of due process.

2. The Attorney General holds unique status under Michigan law, and that status requires accommodation, but not exemption, from the rules of professional conduct. In this case, Monroe suggested that disqualification of the Assistant Attorney General serving on the SERSB was required by the Michigan Court Rules concerning professional discipline. But in the absence of evidence of prejudice to Monroe, the rules did not provide a basis for disqualification.

3. Generally, under MCL 38.24(1)(b), a member of the State Employees' Retirement System who becomes totally incapacitated for duty because of a personal injury or disease which is not the natural and proximate result of the member's performance of duty may be retired if a medical advisor conducts a medical examination of the member and certifies in writing that the member is mentally or physically totally incapacitated for further performance of duty, that the incapacitation is likely to be permanent, and that the member should be retired. For the purpose of deciding eligibility for nonduty disability retirement, a medical examination conducted by one or more medical advisors means either a personal medical examination of the member or a review of the application and medical records of the member. In this case, Kaul's review of Monroe's medical records satisfied the statutory requirement that he conduct a medical examination of Monroe.

4. Although the SERSB has discretion in the decision whether to retire a state employee, it cannot exercise that discretion unless and until the medical advisor certifies that the employee is totally and permanently incapacitated from working. In this case, Monroe asserted that the denial of her benefits was not supported by adequate evidence, but the medical advisor did not certify that she

had suffered a permanent and total disability, and thus the board did not have any discretion to grant the benefits. Further, the conclusion that the disability was not permanent was supported by the medical evidence. The circuit court properly affirmed the SERSB.

5. The SERSB is not bound by a determination of disability issued by any other state or federal agency or private entity when the board is determining whether a member is entitled to a disability retirement. In this case, although Monroe had been granted social security benefits and state long-term disability benefits, the grant of those other benefits depended on different criteria and was irrelevant to her eligibility for nonduty disability retirement benefits.

Affirmed.

1. CONSTITUTIONAL LAW — DUE PROCESS — BIAS — DISQUALIFICATION — ATTORNEY GENERAL.

There are four situations that present a constitutionally intolerable risk of actual bias and warrant the disqualification of a decision-maker: (1) the decision-maker has a pecuniary interest in the outcome, (2) the decision-maker has been the target of personal abuse or criticism from the party before him or her, (3) the decision-maker is enmeshed in other matters involving the petitioner, and (4) the decision-maker might have prejudged the case because of prior participation as an accuser, investigator, fact-finder, or initial decision-maker; there is no inherent bias that results from one Assistant Attorney General representing the retirement system in a contested case hearing while another Assistant Attorney General serves on the State Employees' Retirement System Board.

2. ATTORNEY GENERAL — RULES OF PROFESSIONAL CONDUCT — ACCOMODATION.

The Attorney General holds unique status under Michigan law, and that status requires accommodation under, but not exemption from, the rules of professional conduct.

3. CIVIL SERVICE — STATE EMPLOYEES — RETIREMENT — NONDUTY DISABILITY RETIREMENT — MEDICAL EXAMINATIONS.

Generally, a member of the State Employees' Retirement System who becomes totally incapacitated for duty because of a personal injury or disease which is not the natural and proximate result of the member's performance of duty may be retired if a medical advisor conducts a medical examination of the member and certifies in writing that the member is mentally or physically

totally incapacitated for further performance of duty, that the incapacitation is likely to be permanent, and that the member should be retired; for the purpose of deciding eligibility for nonduty disability retirement, a medical examination conducted by one or more medical advisors means either a personal medical examination of the member or a review of the application and medical records of the member (MCL 38.24[1][b]).

4. Civil Service — State Employees — Retirement — Nonduty Disability Retirement — State Employees' Retirement System Board — Discretion — Certification of Total and Permanent Incapacity.

   Although the State Employees' Retirement System Board has discretion in the decision whether to retire a state employee, it cannot exercise that discretion unless and until the medical advisor certifies that the employee is totally and permanently incapacitated from working.

5. Civil Service — State Employees — Retirement — Nonduty Disability Retirement — State Employees' Retirement System Board — Effect of Determination of Disability by Any Other State or Federal Agency or Private Entity.

   The State Employees' Retirement System Board is not bound by a determination of disability issued by any other state or federal agency or private entity when the board is determining whether a member is entitled to a disability retirement.

*Nino E. Green* for Sandra Monroe.

*Bill Schuette,* Attorney General, *John J. Bursch,* Solicitor General, and *Daphne M. Johnson,* Assistant Attorney General, for the State Employees' Retirement System.

Before: RONAYNE KRAUSE, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM. Petitioner Sandra Monroe appeals by leave granted a circuit court order affirming the denial by the State Employees' Retirement System Board (SERSB) of Monroe's application for nonduty disability retirement benefits. We affirm.

In September 2007, the Alger Maximum Correctional

Facility suspended Monroe, who worked there as a registered nurse, and the prison terminated Monroe's employment in November 2007. Immediately after Monroe's suspension, she sought psychological help and began treatment for a major depressive disorder, post-traumatic stress disorder, as well as generalized anxiety disorder.[1] At some point, Monroe started receiving social security disability benefits. In connection with Monroe's receipt of Michigan long-term disability benefits, she underwent a January 2008 independent medical examination by psychiatrist Dr. Kenneth I. Robbins. Robbins opined that Monroe could not work because of "her Major Depressive Disorder," but he disbelieved that Monroe's depressive disorder qualified as a permanent disability. Robbins predicted that Monroe's "depression will go into remission within 2-3 months . . . ."

In April 2008, Monroe underwent another independent medical examination with psychiatrist Dr. David B. Van Holla. Van Holla confirmed that Monroe "continues to be disabled" because of "her major depressive disorder and resultant anxiety." Van Holla recommended "pharmacological management" and reevaluation in four to six months to ascertain if Monroe had stabilized.

Also in April 2008, Monroe applied for nonduty disability retirement benefits. The Office of Retirement Services referred Monroe for a July 2008 psychiatric evaluation by Dr. Lynn Miller. In Miller's view, Monroe currently remained unable to work, but

> the condition might be remedied by available treatment and I would recommend that she have an opportunity for a treatment assessment by a psychiatrist if possible to assist

---

[1] Although Monroe also experienced physical ailments, on appeal she focuses solely on her mental conditions in support of her disability claim. Therefore, we do likewise.

in developing a treatment plan for possible improvement and/or recovery of her depressive condition. The time required to determine if recovery is possible could last from 6 to 12 months.

In October 2008, psychologist and independent medical advisor to the Office of Retirement Services, Dr. Ashok Kaul, assessed Monroe's mental condition through a review of the medical records of Monroe's treating health-care providers, including Monroe's psychologist, and the reports prepared by Robbins, Van Holla, and Miller. In pertinent part, Kaul summarized:

> She has had three independent psychiatric examinations in 2008 and, while all three independent examiners opined that she is currently disabled from returning to her RN position, all three also opined that she may improve significantly with proper psychiatric care. The evidence overall shows that her mental condition may currently be disabling but that with ongoing psychiatric care including medication management her condition could improve to the point to allow her to return to work. Thus, she is not permanently disabled.

The Office of Retirement Services denied Monroe's application for disability retirement benefits in October 2008, prompting Monroe to request a contested case hearing. Following the hearing, the SERSB issued a decision and order emphasizing that "no doctor has opined that [Monroe] is totally and permanently disabled." The SERSB further observed that "every doctor who has examined [Monroe] has concluded that her condition could improve with proper treatment."[2] The SERSB concluded, "Given that no medical advisor has certified that [Monroe] is totally and permanently dis-

---

[2] The SERSB additionally noted that an independent medical advisor had twice opined that Monroe did "not have a physical condition that would cause her to be totally and permanently disabled."

abled, the Board does not have the discretion to find her so disabled." Monroe then sought circuit court review of the SERSB's denial of disability retirement benefits, and that court affirmed the SERSB.

I

Monroe first avers that the disability eligibility proceedings deprived her of due process because a member of the Attorney General's office was "both the advocate opposing an application for duty disability retirement . . . and a member of the body [SERSB] that denie[d] the application . . . ." Monroe relies on *Crampton v Dep't of State*, 395 Mich 347, 349-350; 235 NW2d 352 (1975), in which the plaintiff's operator's license was revoked when he refused a Lansing police officer's request that he participate in a chemical test to measure blood-alcohol content. The plaintiff "exercised his right to a hearing before the License Appeal Board," a two-member board "composed of a police officer from the Lansing Police Department and a representative of the Secretary of State . . . ." *Id*.[3] The board denied the plaintiff's appeal. *Id*. at 350.

The Michigan Supreme Court summarized its holding as follows: the plaintiff "was denied due process of law. Appeal board panels which are membered by fulltime law enforcement officials are not fair and impartial tribunals to adjudge a law enforcement dispute between a citizen and a police officer." *Id*. The Supreme Court commenced its analysis with the observation that "[a]

[3] The Attorney General held a third membership on the License Appeal Board, but did not participate in the review of the plaintiff's license revocation; the Attorney General's participation was not necessary given "that two members constitute a quorum." *Crampton*, 395 Mich at 350 n 3.

hearing before an unbiased and impartial decision-
maker is a basic requirement of due process." *Id.* at 351.
The Court referred to United States Supreme Court
precedent as having "disqualified judges and decision-
makers without a showing of actual bias in situations
where 'experience teaches that the probability of actual
bias on the part of the judge or decisionmaker is too
high to be constitutionally tolerable.' " *Id.*, quoting
*Withrow v Larkin*, 421 US 35, 47; 95 S Ct 1456; 43 L Ed
2d 712 (1975). The Michigan Supreme Court identified
four situations that presented a constitutionally intol-
erable risk of actual bias warranting disqualification:

> [W]here the judge or decisionmaker
>
> (1) has a pecuniary interest in the outcome;
>
> (2) has been the target of personal abuse or criticism
> from the party before him;
>
> (3) is enmeshed in [other] matters involving peti-
> tioner . . . ; or
>
> (4) might have prejudged the case because of prior
> participation as an accuser, investigator, fact finder or
> initial decisionmaker. [*Crampton*, 395 Mich at 351 (quota-
> tion marks and citations omitted) (second alteration in
> original).]

Although none of the presumptive bias situations
existed in *Crampton*, the Supreme Court deemed
"it . . . impermissible for officials . . . entrusted with re-
sponsibility for arrest and prosecution of law violators
to sit as adjudicators in a law enforcement dispute
between a citizen and a police officer" because "the
probability of actual bias on the part of the judge or
decisionmaker is too high to be constitutionally toler-
able." *Id.* at 356. The Court highlighted that the Lan-
sing police officer who sat on the License Appeal Board
would have to resolve factual issues involving the
reasonableness of the arresting Lansing police officer's

actions, and that "[r]esolution of those factual issues will often turn on appraisal of the credibility of the opposing testimony of the officer and the citizen." *Id.* at 357. The Supreme Court concluded with the following analysis:

> Police officers are full-time law enforcement officials trained to ferret out crime and arrest citizens who have violated the law.
>
> Similarly, the Attorney General and prosecuting attorneys are responsible for prosecution of citizens charged with violation of the law. Prosecuting attorneys and their assistants have been designated to represent the Attorney General on License Appeal Boards although they or others in their office are prosecuting the person whose appeal they are hearing for a drunk driving offense arising out of the incident which prompted the revocation hearing. Crampton was prosecuted and, subsequent to this license revocation hearing, was convicted of a drunk driving offense.
>
> We do not suggest that police officers and prosecutors are not fair-minded. But they are deeply and personally involved in the fight against law violators. As law enforcement officials they are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them "partisan to maintain" their own authority and that of their fellow officers. The risk that they will be unable to step out of their roles as full-time law enforcement officials and into the role of unbiased decisionmaker in a law enforcement dispute between a citizen and a police officer presents a probability of unfairness too high to be constitutionally tolerable. [*Id.* at 357-358 (citations omitted).]

In this case, no indication exists that the Assistant Attorney General who sat as an SERSB member possessed any pecuniary interest in the outcome of Monroe's disability application, faced personal abuse or criticism from Monroe, was enmeshed in any matter

involving Monroe, or had previously served as an accuser, investigator, fact-finder, or an initial decision-maker. See *id.* at 351. Our review of the record simply reveals no evidence of actual bias arising from the Assistant Attorney General's representation of the State Employees' Retirement System in opposition to Monroe's disability retirement application and another Assistant Attorney General's membership in the nine-person SERSB that ultimately denied Monroe's application. MCL 38.3. Nor can we identify a constitutionally intolerable probability of actual bias. Unlike the law enforcement officials who sat in judgment of the "law enforcement dispute between a citizen and a police officer" in *Crampton, id.* at 356, the present circumstances are missing such a clear alignment between the decision-maker, the SERSB, one of whose members is an Assistant Attorney General, and the advocate, an Assistant Attorney General, representing the State Employees' Retirement System; notably, the SERSB has a statutory duty to administer and manage the retirement system for the benefit of retirees from state employment. MCL 38.1 *et seq.* Given the absence of actual bias and any probability of bias, we find no due process violation.

And, to the extent that Monroe suggests that the Attorney General's dual roles in this case violated MCR 9.104(A),[4] both this Court and our Supreme Court have

---

[4] Monroe neglected to specify which subrule in MCR 9.104(A) she intended to reference. Potentially applicable portions of MCR 9.104(A) include the following:

The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:

(1) conduct prejudicial to the proper administration of justice;

recognized the applicability of the rules of professional conduct to government attorneys, including the Attorney General, but have counseled for accommodation in the application of the rules to the Attorney General, in light of that individual's unique status:

> The Attorney General is one of only three constitutionally mandated single executives heading principal departments of state government. Const 1963, art 5, § 3, ¶ 1. An elective official . . . , the Attorney General and her designated assistants provide legal services to the state of Michigan and its hundreds of agencies, boards, commissions, officials, and employees . . . .
>
> *        *        *
>
> We . . . conclude . . . that the cited preamble and comments to the MRPC appropriately suggest the need for studied application and adaptation of the rules of professional conduct to government attorneys such as the Attorney General and her staff, in recognition of the uniqueness of her office and her responsibility as the constitutional legal officer of the state to represent the various and sometimes conflicting interests of numerous government agencies. In other words, the Attorney General's unique status *requires accommodation, not exemption, under the rules of professional conduct.* [*Attorney General v Pub Serv Comm*, 243 Mich App 487, 496, 506; 625 NW2d 16 (2000).]

The Michigan Supreme Court similarly summarized this proposition:

> The Court of Appeals erred in holding that the Attorney General's office is disqualified from acting as special pros-

---

(2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

(3) conduct that is contrary to justice, ethics, honesty, or good morals . . . .

ecutor. While recognizing that the Attorney General is subject to the rules of professional conduct, we hold that disqualification is not required in this case because accommodation of his unique constitutional and statutory status will not infringe on the defendant's right to a fair prosecution. The Attorney General's unique status "requires accommodation," and *such accommodation is particularly apt where no evidence has been presented of any prejudice that would be suffered by the defendant.* [*People v Waterstone*, 486 Mich 942-943; 783 NW2d 314 (2010) (emphasis added) (citations omitted), quoting *Attorney General*, 243 Mich App at 506.]

In the absence of evidence of prejudice to Monroe, we find no basis for disqualification in the Michigan Rules of Professional Conduct or in the Michigan Court Rules pertaining to professional discipline.

II

Monroe further challenges the SERSB's denial of her application for disability retirement benefits on the ground that MCL 38.24 obligated medical advisor Dr. Kaul to personally examine Monroe before making a recommendation concerning disability qualification, rather than merely reviewing Monroe's medical records. According to MCL 38.24(1):

Except as may otherwise be provided in sections 33 and 34, a member who becomes totally incapacitated for duty because of a personal injury or disease that is not the natural and proximate result of the member's performance of duty may be retired if all of the following apply:

\* \* \*

(b) A medical advisor *conducts* a medical examination of the member and certifies in writing that the member is mentally or physically totally incapacitated for further

performance of duty, that the incapacitation is likely to be permanent, and that the member should be retired. [Emphasis added.]

In the previous version of MCL 38.24, the relevant statutory language read, "The medical advisor after a medical examination of such member, shall certify that such member is mentally or physically incapacitated for the further performance of duty, and such incapacity is likely to be permanent and that such member should be retired." 1955 PA 237. Monroe theorizes that the Legislature's insertion of the word "conducts" signifies that the independent medical advisor must now perform an examination of the member in person.

In *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008), our Supreme Court clarified that the interpretation of a statute by an agency charged with its enforcement is entitled to "respectful consideration," and that " 'cogent reasons' for overruling an agency's interpretation" must exist. "However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id.* While no statutory definition of "conduct" appears in the State Employees' Retirement Act and Monroe offers no authority supporting her contention regarding the import of "conduct," the SERSB has adopted a rule elucidating the proper nature of a medical examination. Specifically, Mich Admin Code, R 38.35(1) explains, "For purposes of deciding eligibility for disability retirement under MCL 38.21 and 38.24 of the act, a medical examination *conducted by 1 or more medical advisors means either a personal medical examination of the member or a review of the application and medical records of the member.*" (Emphasis added.) The SERSB's interpretation of MCL 38.24(1)(b), as re-

flected in Rule 38.35(1), does not conflict with the statutory language, and we cannot ascertain any cogent reasons for disregarding the SERSB's interpretation. *Rovas*, 482 Mich at 103.

Consequently, we conclude that Kaul's October 2008 report and recommendation, which he based on his review of three 2008 reports by independent psychiatrists, all of whom evaluated Monroe in person, satisfied the statutory requirement that he "conduct[] a medical examination of the member . . . ." MCL 38.24(1)(b); see also Rule 38.35(1).

III

Monroe lastly disputes that adequate evidence supported the SERSB's decision to deny her disability retirement benefits.

> A circuit court's review of an administrative agency's decision is limited to determining whether the decision was contrary to law, was supported by competent, material, and substantial evidence on the whole record, was arbitrary or capricious, was clearly an abuse of discretion, or was otherwise affected by a substantial and material error of law. Const 1963, art 6, § 28; MCL 24.306. "Substantial" means evidence that a reasoning mind would accept as sufficient to support a conclusion. Courts should accord due deference to administrative expertise and not invade administrative fact finding by displacing an agency's choice between two reasonably differing views. [*Dignan v Mich Pub Sch Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002) (citations omitted).]

> [W]hen reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings. This latter standard is indistinguishable from the clearly erroneous standard of review that has been widely adopted in Michigan jurispru-

dence. As defined in numerous other contexts, a finding is clearly erroneous when, on review of the whole record, this Court is left with the definite and firm conviction that a mistake has been made. [*Boyd v Civil Serv Comm*, 220 Mich App 226, 234-235; 559 NW2d 342 (1996).]

Eligibility for a nonduty disability retirement depends on the applicant's satisfaction of certain prerequisites, including the requirement in MCL 38.24(1)(b) that "[a] medical advisor conducts a medical examination of the member and certifies in writing that the member is mentally or physically totally incapacitated for further performance of duty, that the incapacitation is likely to be permanent, and that the member should be retired."

> The plain language of MCL 38.24 seemingly provides that respondent's discretion to retire petitioner does not arise unless and until the medical advisor, in this case Dr. Fenton or Dr. Obianwu, has certified that the applicant is totally and permanently incapacitated from working. Under this interpretation, because Dr. Fenton or Dr. Obianwu did not so certify, the respondent did not have the discretion to retire petitioner, and the circuit court's order compelling it to do so is contrary to the statute. The language of MCL 38.24 clearly provides that, although the Board has discretion in the decision whether to retire a state employee ("may be retired by the retirement board"), it cannot exercise that discretion unless and until the medical advisor certifies that the employee is incapacitated ("Provided, The medical advisor . . . shall certify that such member is . . . incapacitated . . . ."). [*VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 587; 701 NW2d 214 (2005).]

Monroe criticizes the circuit court's finding, premised on Dr. Kaul's report, that multiple doctors had anticipated that she could return to work when her mental conditions abated. Irrespective of whether Kaul accurately characterized the other doctors' re-

ports when he declared that "all three independent [psychiatric] examiners opined that ... [Monroe] may improve significantly with proper psychiatric care," Kaul did not certify Monroe as totally and permanently disabled, and neither did any of the three independent psychiatrists who evaluated Monroe earlier in 2008. Absent a medical advisor's certification that Monroe suffers permanent and total disability, the SERSB did not possess discretion to retire Monroe. *Id.* at 587.

Furthermore, Kaul's conclusion that Monroe's mental condition could improve and, "[t]hus, she is not permanently disabled," found support in the medical evidence. In January 2008, Dr. Robbins described Monroe's mental condition as "not a permanent disability and it should be anticipated her psychiatric symptoms will go into remission [within two to three months] with proper treatment," allowing Monroe to go back to work. In April 2008, Dr. Van Holla urged for Monroe to begin "pharmacological management" of her mental condition, adding that a reevaluation "in four to six months may be of benefit to determine whether her condition has stabilized." A reasonable person could interpret Van Holla's statements as reflecting his belief that Monroe might improve. Miller expressed in the July 2008 psychiatric assessment that "the condition might be remedied by available treatment," although "[t]he time required to determine if recovery is possible could last from 6 to 12 months." None of the psychiatrists found a total and permanent disability and all believed in the potential for improvement.

In summary, the circuit court did not clearly err when it found the SERSB's denial of Monroe's application for disability retirement benefits consistent with the law and supported by competent, material, and substantial evi-

dence on the whole record. See *Dignan*, 253 Mich App at 576; *Boyd*, 220 Mich App at 234-235.

Monroe additionally takes issue with the failure of the SERSB or the circuit court to take into account as evidence of her disability the fact that she has begun receiving Michigan long-term disability benefits and federal social security disability benefits. The SERSB deemed these facts irrelevant, given that the other awards of benefits depended on different criteria. The SERSB cited Mich Admin Code, R 38.36, which directs, "The board is not bound by a determination of disability issued by any other state or federal agency or private entity when the board is determining whether a member is entitled to a disability retirement provided by MCL 38.21 or 38.24 of the act." Monroe fails to address the administrative rule or the SERSB's explanation that different disability criteria govern the award of disability benefits in different contexts. In light of Rule 38.36 and the lack of authority supporting Monroe's position, the SERSB properly disregarded the other disability determinations.

Affirmed.

RONAYNE KRAUSE, P.J., and SERVITTO and GLEICHER, JJ., concurred.